UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MUSTANG LINE CONTRACTORS INC., Plaintiff, v. THE UNITED STATES, Defendant. | No. 04-901C (Judge Lettow) |

DEFENDANT'S ANSWER AND COUNTERCLAIM

For its answer to the complaint, defendant admits, denies, and alleges as follows:

1. Denies the allegations contained in paragraph 1 for lack of knowledge or information sufficient to form a belief as to their truth.

2. Admits the allegations contained in paragraph 2 to the extent supported by the contract cited, which is the best evidence of its contents; otherwise denies the allegations contained in paragraph 2.

3. The allegations contained in paragraph 3 are conclusions of law and plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

4. Admits the allegations contained in the first sentence of paragraph 4 that BPA gave potential bidders drawings of the BPA's Santiam-Chemawa No. 1 Transmission Line dated June 2, 1953, as part of the solicitation process. Admits allegations contained in the second sentence of paragraph 4 to the extent supported by the drawings cited, which are the best evidence of their contents; otherwise denies all other allegations contained in paragraph 4.

5. Denies the allegations contained in paragraph 5 for lack of knowledge or information sufficient to form a belief as to their truth.

6. Denies.

7. Admits the allegations contained in paragraph 7 that plaintiff presented a claim to the BPA Contracting Officer. Denies all other allegations contained in paragraph 7. Avers that plaintiff's claim was submitted on December 23, 2002, in the amount of $130,357.17. Avers that plaintiff did not certify its claim.

8. Admits.

9. The allegations contained in paragraph 9 are conclusions of law and plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

10. Defendant's responses to paragraphs 1-3 of the complaint are incorporated by reference.

11. Admits the allegations contained in paragraph 11 that plaintiff was on the project for additional time. The remaining allegations contained in paragraph 11 are plaintiff's characterization of its claim to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

12. Admits the allegations contained in paragraph 12 that BPA and plaintiff attempted to negotiate an equitable adjustment to the contract price. The remaining allegations contained in paragraph 11 are plaintiff's characterization of its claim to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

13. Admits allegations contained in paragraph 13 that plaintiff presented a claim to the BPA Contracting Officer. Denies all other allegations contained in paragraph 13. Avers that

on September 18, 2003, plaintiff filed a formal request for payment in the amount of $369,693.28. Avers that plaintiff did not certify its claim.

14. Admits.

15. Admits.

16. The allegations contained in paragraph 16 are conclusions of law and plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact they are denied.

17. Defendant's responses to paragraphs 1-3 of the complaint are incorporated by reference.

18. The allegations contained in paragraph 18 are conclusions of law and plaintiff's characterization of its case to which no answer is required; to the extent they may be deemed allegations of fact they are denied.

19. Denies that plaintiff is entitled to the relief requested or to any relief whatsoever.

20. Denies each and every allegation not previously admitted or otherwise qualified.

AFFIRMATIVE DEFENSES

21. Plaintiff's claims are barred by the affirmative defense of set-off.

22. Plaintiff's claims are barred by the affirmative defense of fraud.

23. Plaintiff's claims are barred by the affirmative defense of payment.

DEFENDANT'S COUNTERCLAIM

1. This Court possesses jurisdiction to entertain the Government's counterclaim pursuant to 28 U.S.C. §§ 1503 and 2508, as well as the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601-611.

2. On March 1, 2002, BPA issued a solicitation for a firm-fixed price contract for the

Santiam-Bethel project.

3. On April 29, 2002, BPA awarded a firm-fixed price contract to Mustang Line for $4,182,675.57 with a completion date of October 1, 2002.

4. On October 24, 2002, Mustang submitted its first claim in the amount of $278,820.53 based on allegations that it had encountered differing site conditions due to the presence of an unanticipated amount of rock. Plaintiff's claim consisted of $175,703.56 in extra labor and equipment costs, $95,009.17 in outside vendor and supplier costs, and $8,107.80 in shot rock disposal costs.

5. Mustang asserted for the first time that it relied upon drawings of the area (circa 1953) that were provided by BPA during the solicitation to determine how much rock it would encounter during construction and how much cost it would incur. These drawings provided no detailed information on the amount of rock contained in the area, but simply labeled areas as "Earth," "Rock and Earth," "Gravel and Earth" and "Rock." Mustang claimed that it assigned values to these labels, assuming "Earth" meant 0 percent rock, "Rock and Earth," meant 12.5 percent rock and 87.5 percent common materials, and "Rock" meant 100 percent rock.

6. BPA requested that Mustang submit its original cost estimate for the contract. An analysis of plaintiff's records revealed that Mustang had not relied upon the maps, but upon a prior similar project it had completed for BPA.

7. During a meeting held on December 19, 2002, Mustang representatives contradicted their earlier statements regarding their reliance upon the maps, stating instead that the estimate was based upon a combination of factors, including previous projects.

8. On December 23, 2002, after meeting with BPA staff, Mustang withdrew its October 24, 2002 claim and submitted a new claim. Mustang's new claim stated that the

anticipated volume of rock was based solely upon the 1953 drawings and instead of assuming 12.5 percent rock and 87.5 percent common material where the plan and profile stated "Rock and Earth," Mustang retroactively changed its assumptions in its proposal, claiming it assumed 50 percent rock and 50 percent common materials. Changing this assumption increased the amount of anticipated rock and decreased the amount of unanticipated rock Mustang claimed in their October 24, 2002 claim.

9. In its December 23 revised claim, Mustang reduced its additional labor and equipment costs from $175,703.56 to $26,052.35. Its additional outside equipment rentals and supplies and costs for disposing of the blasted rock remained the same despite the decrease in unanticipated rock. In total, Mustang requested $130,357.17, compared to $278,820.53 requested in October.

10. On May 27, 2003, BPA denied Mustang's request for payment.

11. On August 28, 2002 BPA issued Contract Amendment Number 8 due to its discovery that some of the steel furnished to construct new towers was defective and the defective steel needed to be replaced. In Amendment 8, BPA agreed that Mustang Line was entitled to an equitable adjustment for changing the defective steel and asked Mustang Line to submit a proposal by September 6, 2002.

12. On September 3, 2002, Mustang provided BPA with a proposal for reimbursement of additional costs under Amendment 8 based upon the assumption that the project would be delayed by 30 days. The proposal was in the amount of $571,462.75, including $206,686.78 for direct labor and equipment costs, $55,948.25 for work orders 11 through 17, $101,425.57 for extended field overhead costs, $54,145.90 for environmental subcontractor costs, $148,992.05 for stand-by equipment costs, and $4,624.20 in decompaction costs.

13. On September 19, 2002, after meeting with BPA representatives, Mustang Line revised its request for payment of its direct costs to $200,096.33 and submitted a revised price proposal for work orders 11-17 in the amount of $53,685.32.

14. On September 24, 2002, BPA issued Contract Amendment 11 in the amount of $200,096.33 for the direct costs. This amendment also included a 14-day time extension from October 3, 2002 through October 17, 2002.

15. On October 7, 2002, BPA notified Mustang Line that it would not pay the foremen costs submitted with work orders 11 through 17 due to its discovery that Mustang Line was "double billing" for these costs. Mustang Line had included its foremen costs as both a direct cost and as an extended overhead cost in its requests for reimbursements in work orders 11 through 17.

16. On October 10, 2002, Mustang Line raised its objection to BPA's refusal to continue to pay the direct costs of the foremen.

17. On October 25, 2002, contract work was substantially completed.

18. On October 30, 2002, BPA issued Contract Amendment 13, extending the contract eight days from October 17, 2002 to October 25, 2002, the actual completion date.

19. On December 19, 2002, BPA and Mustang Line officials met to discuss all outstanding issues. At this meeting, BPA addressed the "double billing" of foremen costs. After discussion, BPA stated it would pay the foremen costs by paying 100 percent of the extended overhead coverage but only 50 percent of additional direct costs for foremen. Additionally, BPA challenged Mustang Line's September 2, 2002 proposal because it was based upon an assumed 30-day delay, when the actual delay was 22 days.

20. On March 5, 2003, BPA issued Contract Amendment 21 in the amount of $49,822.00 for work orders 11-17.

21. On June 17, 2003, BPA informed Mustang Line that pursuant to the contract, Mustang Line owed BPA $2,639.82 for loss, waste or damage of BPA supplied materials and $20,503.17 for BPA inspectors' overtime work up to August 17, 2002. Mustang agreed to pay the $2,639.82, but refused to pay the $20,503.17.

22. BPA audited Mustang's indirect costs from the September 3, 2002, claim and provided results to Mustang Line on September 2, 2003. BPA's audit concluded the following:

a. Mustang Line's allowable extended field office overhead costs were $71,995.00. BPA disallowed $29,431.00 of Mustang Line's claimed $101,425.57 because the costs should have been based upon a 22-day delay, not a 30-day delay. Additionally, the costs for the land liaison officer should have been based on a 14-day delay, as BPA discovered he left the project 14 days into the contract delay.

b. Only $3,516.00 of the claimed $54,145.90 for environmental subcontractor costs was properly allowable. Additionally, some of Mustang Line's costs requested under the extended contract were covered under the original contract, as they were for work that would have been performed regardless of the contract's extension.

c. Only $49,986 of the claimed $148,992.05 for standby equipment costs was properly allowable. The costs were based upon a 30-day and not a 22-day delay. Additionally, BPA discovered that some of the standby equipment was not needed at the site even the full 22 days.

23. On September 18, 2003, Mustang Line filed its formal request in the amount of $369,693.28 for the unresolved Amendment 8 items, Extended Field Office Overhead,

Environmental Subcontractor, Standby Equipment, and Right-of-Way Compaction, and the two unresolved Work Orders, 56 and 57. The claim was itemized as follows:

| | |
|---|---|
| Work Order No. 56 (picking up and delivering steel and other work) | $ 31,050.84 |
| Work Order No. 57 (steel extra work, structures 17/3-2/5) | $ 29,814.72 |
| Extended Field Office Overhead | $101,425.57 |
| Environmental Subcontractor | $ 54,145.90 |
| Standby Equipment | $148,992.05 |
| Right-of-Way Compaction | $ 4,264.20 |

24. On October 27 and 29, 2003, BPA completed an audit review of Mustang Line's work orders 57 and 56 respectively. The auditor concluded the following:

a. Only $6,422 of the claimed $31,050.84 for Work Order 56 was allowable. BPA concluded that Mustang Line overstated its costs by $24,629.00 because it included costs already covered by the original contract, costs that were "double billed" under both direct and indirect costs (Mustang Line reverted to its original method of billing 100 percent of foremen costs as both a direct and indirect cost), costs charged as Mustang Line employee costs that were subcontractor costs, and costs previously paid under another contract amendment

b. Only $18,363 of the claimed $29,814.72 for Work Order 57 was properly allowable. BPA concluded that Mustang Line overstated its costs by $11,452 because it included costs paid under Work Order 56, costs that were "double billed" under both direct and indirect costs (Mustang Line reverted to its original method of billing 100 percent of foremen costs as both a direct and indirect cost) , costs previously paid under other amendments, costs not reflected in payroll records, and costs inadequately documented.

25. On November 6, 2003, the BPA Contracting Officer determined, based on the

audit results, that Mustang Line was entitled to $152,474 for Work Orders 56 and 57 and for the other Amendment 8 items. From this, BPA deducted $23,143, which was the amount Mustang Line owed BPA.

FIRST COUNTERCLAIM

(31 U.S.C. § 3729(a))

19. Mustang knowingly or with reckless disregard submitted claims to the Contracting Officer that included costs funded by the original contract, previous work orders or contract amendments or that were billed twice as both a direct and an indirect cost.

20. Mustang knowingly or with reckless disregard submitted claims to the Contracting Officer that included costs not reflected in its records.

21. Mustang knowingly or with reckless disregard submitted claims to the Contracting Officer that included costs that are unrelated to the additional work or time requested.

SECOND COUNTERCLAIM

(41 U.S.C. § 604)

22. Mustang intended to mislead the Government when it knowingly submitted claims to the Contracting Officer that included costs funded by the original contract, previous work orders or contract amendments or that were billed twice as both a direct and an indirect cost.

23. Mustang intended to mislead the Government when it knowingly submitted claims to the Contracting Officer that included costs not reflected in its records.

24. Mustang intended to mislead the Government when it knowingly submitted claims to the Contracting Officer that included costs that are unrelated to the additional work or time requested.

WHEREFORE, defendant requests that the complaint be dismissed, that judgment be entered in favor of defendant in the amount of $23,143.00, plus interest, that a fine of not less than $5,000 per violation and not more than $10,000, plus an amount presently indeterminable for violations of 31 U.S.C. § 3729(a), such sum duly trebled together with attorney fees and costs, and for violations of 41 U.S.C. § 604; and such other and further relief as this Court deems just and proper.

Respectfully submitted

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Lindsay Williams
LINDSAY WILLIAMS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Phone: (202) 353-7995
Fax: (202) 514-8624

Attorneys for Defendant

Of Counsel:
JACILYN MARGESON
PAUL MAUTNER
Bonneville Power
General Counsels Office

September 9, 2004